[Civ. No. 50511. Second Dist., Div. Two. Mar. 21, 1978.]

ANDREW JOHNS, Plaintiff and Respondent, v.
CITY OF LOS ANGELES et al., Defendants and Appellants.

JOHNIE S. CHOYCE, Plaintiff and Respondent, v.
CITY OF LOS ANGELES et al., Defendants and Appellants.

**COUNSEL**

Burt Pines, City Attorney, John T. Neville, Sr., Assistant City Attorney, and Daniel U. Smith, Deputy City Attorney, for Defendants and Appellants.

Irmas, Simke & Chodos, Cochran, Atkins & Evans, Sydney M. Irmas, Jr., David Manning Chodos and Pamela Trescott Ashman for Plaintiffs and Respondents.

## OPINION

**COMPTON, J.**—In these consolidated wrongful death actions, plaintiffs, the parents of the decedent, sought damages against the City of Los Angeles and two members of the Los Angeles Police Department[1] for the shooting death of the decedent.

The shooting occurred when police officers of the City of Los Angeles, seeking to arrest a suspect for a crime committed in that city, mistakenly entered the apartment of decedent in the City of Inglewood. In a struggle which ensued, decedent, who was a black man, was shot.

At the conclusion of a nine-week trial the jury returned a nine to three verdict for defendants. Subsequently, the trial judge granted a motion for a new trial. Defendants appeal from that order.

In an unpublished opinion filed October 5, 1977, we affirmed the order granting a new trial. Our decision was grounded on the traditional deference afforded to the exercise of the trial judge's discretion by a court of review.

Subsequently we granted defendants' petition for a rehearing in order to further examine into the question of whether under the unique circumstances of this case the granting of a new trial was truly a valid exercise of discretion or whether in fact defendants have been arbitrarily and improperly deprived of a judgment in their favor.

There has been a line of judicial decisions "which has expressed itself in recent years with increasing frequency to the general effect that *the failure* [of appellate courts] to 'probe the mental processes' of the . . . judicial decision-maker is 'destructive of judicial responsibility.' " (Kennedy, *The Substantial Evidence Test: A Cover-Up for Insubstantial Due Process* (Dec. 1974) 50 L.A. Bar Bull. 72, 73; also see *In re Sturm,* 11 Cal.3d 258 [113 Cal.Rptr. 361, 521 P.2d 97].)

---

[1]There were a number of other defendants named in the complaint who are no longer parties to the action.

"[D]iscretion equated only with the feelings and hunches of the trial judge is not amenable to *objective evaluation* and appellate review, for the end result would be nonreviewable trial judge discretion—in essence, no appeal whatsoever." (*Knecht* v. *Marzano* (1964) 65 Wn.2d 290 [396 P.2d 782, at p. 785].) (Italics added.)

The proper exercise of trial court discretion " 'imports the exercise of discriminating judgment within the bounds of reason.' " (*Gossman* v. *Gossman,* 52 Cal.App.2d 184, at p. 195 [126 P.2d 178].)

Code of Civil Procedure section 657, which authorizes a trial judge to grant a new trial, underwent substantial amendment in 1965. One of the main features of the amendment was the requirement that a trial judge, in granting a motion for a new trial, file a written statement of the grounds and reasons therefor.

This latter requirement was a clear indication of the Legislature's desire for closer appellate scrutiny of those trial court orders which set at naught the product of a costly and time consuming trial.

Our Supreme Court perceived that legislative purpose and spoke forcefully on the subject of the appellate review of new trial orders in two cases which followed the 1965 amendment.

In *Mercer* v. *Perez,* 68 Cal.2d 104, at page 114 [65 Cal.Rptr. 315, 436 P.2d 315], the court stated: ". . . the principle that an abuse of discretion cannot be found in cases in which the evidence is in conflict . . . constitutes an iron curtain, cutting off any adequate review of whether or not there was *any* reason for the trial judge to . . . grant a new trial.' "

Later in *Scala* v. *Jerry Witt & Sons, Inc.,* 3 Cal.3d 359, at page 363 [90 Cal.Rptr. 592, 475 P.2d 864], the following appears. "In *Mercer* v. *Perez,* . . . [w]e explained that the requirement of a specification of reasons served the two-fold purpose of encouraging careful deliberation by the trial court before ruling on a motion for new trial, and of making a record sufficiently precise to permit *meaningful* appellate review." (Italics added.)

■ With these principles in mind we proceed to examine the order for a new trial in this case. Plaintiffs noticed a motion for a new trial on the following grounds:

(1) Irregularity in the proceedings;

(2) Misconduct of the jury;

(3) Insufficiency of the evidence to justify the verdict; and/or

(4) The verdict is against the law; and

(5) Error in law occurring at the trial.

Plaintiffs supported their motion with affidavits by two of the dissenting jurors, Jury Foreman Reed and Juror Maille which attributed to various other members of the jury statements allegedly made during the course of deliberation.

Defendants countered with affidavits of the remaining 10 jurors, including the third dissenting juror, essentially denying that such statements were made.

At the hearing on the motion for a new trial no evidence was received in other than affidavit form. Plaintiffs' counsel basically argued two grounds for the motion (1) insufficiency of the evidence to support the verdict, and (2) misconduct of the jury. As to the latter ground the focus was entirely on a claim that members of the jury were racially biased and concealed that fact on voir dire.

The "Order Granting New Trial and Specifications" (hereinafter the Order) filed by the trial judge recites seven statements allegedly made by four of the majority jurors which are variously characterized as either (1) jury misconduct, or (2) indicating a bias concealed on voir dire. In connection with each specification there is reference to page and line of the various affidavits.

In conclusion the Order states "The above specifications of irregularities in the proceedings of the jury, and/or jury misconduct, clearly indicates that the plaintiffs did not receive a fair evaluation of the evidence from an unbiased jury."

The only reasonable interpretation which can be drawn from the Order is that the trial judge granted the motion on the grounds that certain jurors had, on voir dire, concealed a racial bias. From the failure to include in the Order any grounds for granting the motion other than

jury misconduct we can only conclude that the trial judge believed that the evidence supported a defense verdict and that the verdict was in all other respects invulnerable. (*Mercer* v. *Perez, supra,* 68 Cal.2d 104; Code Civ. Proc., § 657.)

Thus we are presented with another case of, in our opinion, those too frequent attempts to impeach a jury's verdict by jurors disclosing what allegedly occurred during the "give and take" of jury deliberation. The evidence upon which the Order here was based came entirely from jurors and consisted of statements allegedly made by some jurors and overheard by others.

■ Evidence Code section 1150 permits the use of any *otherwise admissible evidence* of occurrences either within or without the jury room which occurrences are likely to have improperly influenced the verdict. But that section further provides that *no evidence is admissible to show the effect of such occurrences on the jurors' mental processes* and further provides that the code in no way affects the law relating to the competence of jurors to give evidence to impeach the verdict.

"This distinction. between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved, ... has been the basic limitation on proof set by the leading decisions allowing jurors to impeach their verdicts." (*People* v. *Hutchinson,* 71 Cal.2d 342, at p. 349 [78 Cal.Rptr. 196, 455 P.2d 132].)

■ Evidence Code section 1150 does not alter the traditional rule that jurors may not impeach their verdict except in the case of a verdict arrived at by lot or chance (Code Civ. Proc., § 657, subd. 2) or where a juror has a bias which was concealed on voir dire.

■ In this context, the "otherwise admissible" requirement of Evidence Code section 1150 raises the threshold question of the application of the hearsay rule. (*Weathers* v. *Kaiser Foundation Hospitals,* 5 Cal.3d 98 [95 Cal.Rptr. 516, 485 P.2d 1132].)

The evidence can escape the interdiction of the hearsay rule and Evidence Code section 1150 if it is offered to establish simply that the statements were made by the jurors, i.e., so-called "verbal acts," and not to prove the truth of what was said or the effect of the statement on the

jurors' mental processes in arriving at a verdict. *(Weathers* v. *Kaiser Foundation Hospitals, supra.)*

Accepting the proposition that the trial judge received the evidence for the purpose of showing that the statements were made, the next inquiry is whether the fact of making the statements was relevant and tended to establish a legally recognizable basis for upsetting the verdict. Evidence Code section 1150 does not envision a procedure whereby a trial judge, as a result of a claim of jury misconduct, reviews a "replay" of the particular language used by various jurors as they deliberated and makes a subjective determination of its propriety. Such a procedure would be too great an extension of the court's limited authority to invade the traditionally inviolate nature of the jury proceedings.

An application of these principles to the Order in this case leads us to conclude that only the evidence tending to show that two of the alleged statements were made—one by Juror Pepper and one by Juror Miller—could possibly serve to support the Order. The two statements referred to are the only ones which the trial judge himself characterized as evidencing a concealment of bias on voir dire. The other specifications set forth by the trial judge would not, even if accepted, constitute grounds or reasons for granting a new trial.

The two jurors in question were both examined on voir dire in a fairly general fashion concerning their ability to give both parties a fair trial. Both indicated under oath that they knew of no reason why they could not decide the case fairly according to the law and the evidence. Testimony under oath is presumptively truthful. (Evid. Code, § 520.)

The issue before this court is whether the factual findings that the statements were made by the jurors, as alleged, is supported by substantial evidence and if so whether the making of the statements constituted substantial evidence of a bias against the plaintiffs which prevented the jurors from rendering a fair and impartial verdict and which bias was concealed on voir dire. *(Evans* v. *Superior Court,* 107 Cal.App. 372 [290 P. 662].) If not, then the Order for a new trial was an abuse of discretion.

The trial judge, when he decided the question of fact that a bias was concealed by certain jurors, was bound by the same settled rule of law which he embraced in one of his instructions given to the jury.

"By a preponderance of the evidence is meant such evidence, as when weighed with that opposed to it, has more convincing force and the greater probability of truth. In the event that the evidence is evenly balanced so that you are unable to say that the evidence on either side of an issue preponderates, then your finding upon that issue must be against the party who had the burden of proving it."

Thus plaintiffs on the motion for a new trial had the burden of proving by a preponderance of the evidence that the controverted statements were made and that the jurors who made them had in fact committed perjury on voir dire. (Evid. Code, §§ 115, 500, 520.) The trial judge's decision similarly had to be based on a finding that the preponderance of evidence established those two facts.

## JUROR PEPPER

The order recites that Juror Charles Pepper stated:

"I wonder how long these lawyers shopped to get this black judge." Support for this finding is set out by reference to the page and line of the affidavits of five jurors; Foreman Reed and Cleda Maille (two of the minority jurors), Geraldine De Pauw, Roger Miller and Nathaniel Williamson.

Foreman Reed's affidavit states: "*On several occasions* during the trial of this action and later in the jury room while the jury was deliberating after the cause was submitted to the jury, Charles W. Pepper stated to another juror and also *in the presence of the entire jury* and myself, the following statement, 'I wonder how long these lawyers shopped to get this Black Judge.' " (Italics added.)

Juror Maille's affidavit contains the following statement: "On several occasions during the trial of this action and later in the jury room while the jury was deliberating after the case was submitted to the jury, Jury Foreman *Stanley Reed, Jr. overheard a comment made by Charles W. Pepper to Roger S. J. Miller* which stated, 'I wonder how long these lawyers shopped to get this Black Judge?' "

Significantly Juror Maille does not claim to have heard the statement. The other jurors whose affidavits are referred to in the order all deny having heard the statement. The affidavits of the remaining jurors

including Juror Pepper and Juror McGaugh (the third dissenting juror) submitted by defendants all contain denials that the statement was made.

Thus the evidence in support of the Order as it pertains to Juror Pepper consists solely of the affidavit of Foreman Reed who claims that the statement was made several times in the presence of the entire jury.

On the other side of the ledger, however, there is the fact that, in spite of Foreman Reed's allegations, no other juror claims to have heard the statement, including the other two dissenting jurors.

Additionally, the record reveals that during its deliberation the jury gave every indication of being a conscientious group striving earnestly to apply the law to the facts, uninfluenced by considerations of race. For example, the jury elected Reed, its only Black member, as foreman. The jury's concern over the correct application of the law was manifested by several requests, commencing on the first day of deliberation, to the judge for clarification of the instructions. These inquiries, in the form of handwritten notes by Foreman Reed, never, at any time stated or suggested that any member of the jury had acted improperly or that their requests for assistance were prompted by other than a sincere desire to reach a just verdict.

Plaintiffs rely heavily on *Weathers* v. *Kaiser Foundation Hospitals, supra,* 5 Cal.3d 98, for the proposition that the rule with respect to acceptance of testimony has been extended to testimony in affidavit form. We are aware that such extension has been made in various factual settings. (See *Clemens* v. *Regents of University of California,* 8 Cal.App.3d 1 [87 Cal.Rptr. 108].) *Weathers,* however, is factually and markedly distinguishable from the case at bench.

In *Weathers,* where allegations of misconduct were set forth in the affidavits of the minority jurors, only six of the nine members of the majority filed counterdeclarations. Those counterdeclarations were described by the Supreme Court as "silent" or "evasive" as to some of the allegations of the dissenting jurors. In the case at bar not only did all nine of the majority jurors deny any bias and deny that the alleged statements were made but the third dissenting juror corroborated their denials.

■ The well-accepted rule, that a trial judge may accept the testimony of one witness worthy of belief as against a number of others

to the contrary who are not as convincing, is based primarily on the fact that in a trial of a contested issue the witness takes an oath in the presence of the court, testifies in open court confronting the court and the adversary party, may be subjected to rigorous cross-examination by the adverse party and/or the court, and during the process is subjected to the careful scrutiny of the court. Witnesses who testify on controverted issues of fact or opinion communicate the character and credibility of their persons and their own sincerity and belief in the truth and accuracy of what they say with much more than the mere spoken word.

In our opinion a trier of fact does not have the same unfettered right to accept the untested averments in one affidavit as against eleven to the contrary, as he would have if all the affiants testified in open court, without at least articulating some cogent reason for doing so.

■ As was stated in *Gossman* v. *Gossman, supra,* 52 Cal.App.2d 184, at page 194, "Even within its legal limits [judicial discretion] . . . is not unbridled. The mere fact that a court may have jurisdiction to make an order does not equip it to exercise *judicial discretion.* Its acts must not only be confined within the field of *discretion* but must also be of a character within the bounds of the limiting adjective 'judicial.' To exercise that power *all the material facts in evidence must be both known and considered,* . . ." (Italics added.)

■ We indicated earlier that as to Juror Pepper the trial judge did purport to rest his finding on *portions* of the affidavits of three jurors other than Reed and Maille. This reference to those affidavits as we will discuss *infra,* serves to highlight the extent of the trial judge's selectivity in picking out parts of the affidavits which appeared to support his finding, and rejecting those parts which did not. It also demonstrates the need for careful scrutiny of affidavits of jurors which seek to impeach a verdict on the basis of what another juror is alleged to have said during the exchanges which occur in jury deliberations.

In order to portray the background and context in which Juror Pepper allegedly spoke we think it necessary, at the risk of lengthening this opinion, to describe certain events that occurred prior to and during jury deliberation.

The case was tried basically on a theory of negligence. The trial court among other things instructed the jury that the two police officers were trespassers in the apartment where the shooting took place.

From the beginning of the deliberations it appears that that instruction caused some confusion among the members of the jury. This confusion was evidenced by notes to the judge asking for clarification.

After two days of deliberation, Foreman Reed sent a note to the judge asking whether the fact that the officers were trespassers constituted negligence on their part. The court did not answer the question but simply sent all the jury instructions into the jury room.

Following five days of deliberation, Foreman Reed sent the judge a note indicating that the jury was hopelessly deadlocked "4-2-6." It appears that the jury could not agree on liability.

After a discussion between the court and the jurors which indicated that the above mentioned instruction was still causing confusion, the judge, *at plaintiff's request,* told the jury to disregard the instruction and simply decide whether the officers' conduct after they entered the apartment "was reasonable in light of all the circumstances."

One of the jurors (not Pepper) evidencing some irritation, *stated in open court* "We should have had that five days ago." A verdict was then returned about 35 or 40 minutes later.

This irritation was apparently shared by Juror Pepper and led him to make a remark concerning the judge. The affidavits of three jurors, other than Reed and Maille, all state that Juror Pepper made a remark to the effect that he "wondered" how the case was assigned to "this judge." It is those three affidavits which the judge cited as support for his order.

There is, however, nothing in the Order or in the remainder of the record which suggests any basis for the trial judge choosing to believe those portions of the jurors' affidavits while at the same time rejecting statements in those same affidavits that Juror Pepper at no time used the word "Black."

For his part Juror Pepper, in his affidavit, frankly admitted his dissatisfaction with the judge's handling of the case and conceded that he did say "I wonder how this case ended up in this court." He denied ever referring to the judge as "Black."

He stated that at one point in the deliberations he voted for the plaintiffs and Reed in his affidavit confirms that at one point the jury was

nine to three for plaintiffs. This fact totally belies any bias against the plaintiffs on the part of Juror Pepper—a fact totally ignored by the trial judge.

It is significant to us that at the hearing on the motion for a new trial the comments of the trial judge were almost entirely devoted to Pepper's criticism of him and his instructions—an issue which bore no relevancy to the issue of bias against the plaintiffs. Again we can perceive no sound reason for the judge choosing to believe Pepper's affidavit in part and rejecting the remainder.

The dispute over the statement made by Juror Pepper turns on the use of the single word "Black." There seems to be no doubt that if Pepper in fact used the word "this" no one could have considered it an indication of bias against plaintiffs.

There is always an inherent problem of accuracy and interpretation attending an attempt by one person to recount, at a later time, the oral utterances of another.

Assuming arguendo that Juror Pepper made the statement as alleged, the question then is whether the statement is indicative of a concealed bias which prevented Juror Pepper from giving the plaintiffs a fair trial. No claim is made that Juror Pepper on any other occasion used any of the derogatory terms commonly associated with racial bias.

Reference to a black judge as "Black" is, on its face, neither derogatory nor uncomplimentary, nor does it suggest bias. The alleged statement in no way approximates the racial slur attributed to the juror in the *Weathers* case, ("where [I] come from they don't even let a black woman into the courtroom.").

To extrapolate from the alleged statement a finding that at the time the juror answered the voir dire questions he did not do so honestly and without a bias which would prevent him from giving the plaintiffs a fair trial, requires considerable speculation.

In the absence of a much clearer picture of the circumstances, the tone of voice, facial expressions and all of the other factors which give meaning to the spoken word, than is available from the affidavit of Juror Reed, such speculation is simply unwarranted. The statement is more indicative of a transitory or momentary expression of pique with the

judge, occasioned by events which occurred at the trial, than it is evidence of a pervasive bias against black people.

The test of whether Juror Pepper's participation in the verdict is grounds for setting that verdict aside is whether he was, at the outset, disqualified from serving because of a state of mind which he concealed.

 It was necessary then for the trial judge, before granting a new trial, to find that at the outset of the trial the juror as a "demonstrable reality" (*People* v. *Compton,* 6 Cal.3d 55, 60 [98 Cal.Rptr. 217, 490 P.2d 537]) was, because of a general bias against the plaintiff (*Self* v. *General Motors Corp.,* 42 Cal.App.3d 1, 11 [116 Cal.Rptr. 575]) irrevocably committed to vote against the plaintiff regardless of the facts that might emerge in the trial (*Witherspoon* v. *Illinois,* 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 785, 88 S.Ct. 1770]).

We conclude that there is simply insufficient evidence in the record to support a finding either that Juror Pepper made the statement attributed to him or that he harbored a bias against the plaintiffs' cause which he concealed on voir dire. Our conclusion is fortified in no small degree by the failure of Foreman Reed, any time prior to the verdict, to report any indication of juror bias or misconduct.

JUROR MILLER

As to Juror Miller the order states:

"The following statement shows irregularities and misconduct by Roger S. J. Miller. 'Who do you mean—that burr head.' The statement indicates a concealed bias against Black people on voir dire examination."

The affidavit of Juror Maille, cited as the basis for that finding, states: "During a recess or break in the trial, Roger S. J. Miller and I were standing in the hall outside Department SW'M' waiting for court to reconvene. Prior to reentering the court room, Elizabeth White, the court reporter in Department SW'M' exited the restroom and in passing us smiled at me. I then commented to Roger S. J. Miller that she (Elizabeth White) seems very friendly and always smiles. Roger S. J. Miller then replied 'Who do you mean—that "burr head"?' "

This allegation is nowhere corroborated. Juror Miller in his affidavit states: "I have never referred to the court reporter as a 'burr head.' That language is not a part of my vocabulary. I specifically deny such a remark ever having been said to Cleda Maille, regarding Elizabeth White or anyone else."

Interestingly, Juror Maille attributed other supposedly improper statements to Miller as well as to other jurors. These statements were also denied by the jurors to whom they were attributed. The trial judge completely ignored these other allegations apparently as unworthy of belief.[2] Juror Maille's credibility was certainly suspect. The following comments about Juror Maille appear in the affidavits of some of the other jurors.

Juror Ver Halen: "Cleda Maille was the most opinionated and least open of any juror in the jury room. She was not willing to discuss the question of liability, but rather stated in words to the effect, 'all I know is that her son is dead and she ought to get something.' "

Juror De Pauw: "Cleda Maille came into the jury room after the jury had been originally instructed on Monday, March 15, 1976 and told the jurors that her mind was made up. She indicated that nothing was going to change her mind and that nothing anyone could say would change her mind. She stated her point of view, and thereafter did not participate in deliberations at all.

"In stating her point of view, Cleda Maille referred to the defendants . . . as 'murderers.' "

Juror Moninger: "After electing Mr. Reed foreman, an initial ballot was taken to say where the jurors stood. At that time, most of the jurors stood for the defendants.

"Cleda Maille threw-up her hands and stated, 'I'm for the plaintiffs.' Thereafter [she] refused to deliberate. She stated that 'It doesn't matter, we should give them the $1½ million that Mr. Cochran [plaintiffs' counsel] asked for in his argument. The City of Los Angeles doesn't have to pay it. They're covered by insurance.' "

---

[2]For example, Juror Maille claims that Miller said "I lied to get on this jury and I can lie to get off." She also alleged that another female juror appeared to be enamored of one of the police officer defendants and speculated "I wonder how good Officer Hurley is in bed."

Juror McGaugh (the third dissenting juror):

"I recall Cleda Maille saying we should award one and one-half million dollars, as Mr. Cochran requested."

The specification of reasons again gives no hint as to why the trial judge chose to believe part of what Juror Maille said and to disbelieve other parts, nor is there any apparent reason for the judge believing Maille and disbelieving the other jurors, especially when in the other parts of the Order he apparently felt those same jurors were credible.

It is evident that in reaching his conclusion he failed to consider all of the evidence—which consideration is essential to a proper exercise of judicial discretion. (*Gossman* v. *Gossman,* 52 Cal.App.2d 184 [126 P.2d 178].)

Furthermore, while the statement attributed to Juror Miller is, on its face, considerably more offensive than the statement attributed to Juror Pepper, the same analysis concerning the reflection of bias which we gave to the latter's statement is applicable here.

There is simply insufficient evidence here to support the finding that Juror Miller made the statement attributed to him or that he harbored a bias against plaintiffs which was concealed on voir dire.

In summary then what we have here is an order for a new trial based upon two specifications with each specification resting on the affidavit of a single juror. In the case of each specification, the affidavit of the single juror is controverted by all of the other jurors. The trial judge's specification of reasons is completely devoid of any explanation of his reasons for rejecting the ostensibly and presumptively truthful affidavits of 11 jurors in favor of accepting the affidavit of a single juror.

The "Order Granting New Trial and Specifications" in this case may be said to superficially comply with the requirements of Code of Civil Procedure section 657, but because of the failure of the trial judge to further articulate the reason for his decision on the credibility of the affidavits, we do not have before us a record which is susceptible of "meaningful review." (Cf. *In re Smith,* 65 Cal.App.3d 291 [135 Cal.Rptr. 5].) Without the aforementioned explanation we are unable to "probe the mental processes of the decision maker." The face of the record discloses only an unexplained decision which appears to have no solid

legal or factual basis. In such a situation the underlying spirit and purpose of Code of Civil Procedure section 657 dictates a conclusion that the decision was arbitrary and an abuse of discretion.

The Order is therefore reversed.

Roth, P. J., and Beach, J., concurred.

A petition for a rehearing was denied April 13, 1978, and respondents' petition for a hearing by the Supreme Court was denied June 1, 1978. Bird, C. J., Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.