[No. B071943. Second Dist., Div. Seven. Nov. 4, 1993.]

DREW HERRICK, Plaintiff and Appellant, v.
QUALITY HOTELS, INNS AND RESORTS, INC., et al., Defendants and
Appellants.

## Counsel

Noel Shipman for Plaintiff and Appellant.

MacLachlan, Burford & Arias and Dennis J. Mahoney for Defendants and Appellants.

## Opinion

**LILLIE, P. J.**—Quality Hotels, Inns and Resorts, Inc. (Quality)[1] appeals from judgment entered in favor of Drew Herrick on his complaint for intentional infliction of emotional injury. Quality contends the emotional distress inflicted on Herrick was remediable solely within the workers' compensation system, that there was no substantial evidence of ratification of the alleged tortious act by responsible corporate management, that the awards of general, special and punitive damages were not supported by the evidence, that the court erred in admitting evidence of the arrest of Herrick's attacker and that Herrick's counsel's misconduct was prejudicial.

Herrick appeals from judgment entered contending the jury's punitive damage award of $150,000 was appropriate and the court erred in reducing it to $75,000.

### Statement of Facts and Procedural History

On January 5, 1990, Herrick began working as a security guard for Quality. Steve Wilson, his supervisor and the director of security, told

---

[1]Quality was named in the complaint as Quality Inn Hotel and answered as Quality Hotels, Inns and Resorts, Inc. Quality asserts, however, that its proper name was Comfort California, Inc., doing business as Quality Hotel, Los Angeles Airport. It appears undisputed that Comfort California, Inc., a California corporation, owned Quality Hotel, Los Angeles Airport, the facility at which the incident occurred.

Herrick he was to patrol the grounds and the garage and help guests with questions regarding safety. Additionally, Herrick was to watch for transients, make sure cars were secure, handle noise and other complaints and to make sure employees were not stealing items from the hotel. Herrick was not allowed to carry a gun. It was "stipulated" in the employee handbook that guns were not allowed on the premises or to be worn at any time.

Herrick did not like Wilson. Herrick noticed that on numerous occasions Wilson carried a gun and would show it to Herrick and other employees. Wilson lived in the hotel and had the guns in the hotel.

On one occasion, Waddah Anani, the general manager of Quality, was present when Wilson showed his gun to another employee. Herrick told Anani about Wilson's guns, and Anani said he knew about them and not to worry. The guns made Herrick feel very uneasy.

About a month before the within incident, Herrick observed Wilson grab a female employee and pull her as she was attempting to go into an elevator to speak to Anani. Herrick believed Wilson said, "come here, bitch. You are not going up there." The employee "jerked away," and before Herrick knew it, the police were there and Wilson was handcuffed and led away. Herrick believed the charges against Wilson were later dropped. Anani witnessed Wilson's arrest.

Prior to Herrick's termination as a security guard, he had been written up for various performance problems with the hotel. One time, Wilson gave Herrick a written reprimand for leaving the hotel premises during working hours even though Wilson had given Herrick permission. On another occasion, Herrick was reprimanded for being late even though he had called.

On March 10, 1990, Herrick's car would not start and he borrowed a friend's car to get to work. Herrick called his employer and said he would be late. When Herrick arrived at 9:15, he encountered Wilson in the garage. Wilson got out of his car, had a slip in his hand and told Herrick, "you need to sign this." Herrick observed it was a termination notice and tried to explain that he had called and that he had no control over the car problem. Wilson said it was no excuse and he was tired of Herrick. When Herrick refused to sign the slip and said he wanted to speak to Anani, Wilson drew his gun and said he was going "to blow [Herrick's] fucking head off, that if [Herrick] went to talk to Mr. Anani, Mr. Anani didn't have time for [Herrick], and to get off the property." Herrick was shocked and thought he was going to die right there. Herrick left, went to an adjacent hotel and telephoned Anani. Herrick said that Wilson had just pulled a gun on him and

threatened to blow Herrick's head off. Anani said that Wilson had just talked to him and asked Herrick to come over to talk. Anani reassured Herrick, "don't worry. I'll be there. We will talk. Don't worry."

Herrick went to the hotel lobby, "shaking like a leaf," and saw that Anani was not there. Herrick saw Wilson come in the side entrance of the hotel and Herrick was "shaking even more." Herrick went to Anani's room and was livid, excited and nervous. Anani asked Herrick to come to the office and again assured Herrick nothing was going to happen.

Anani brought Wilson into the office, and Wilson denied he had pulled a gun on Herrick. Anani told Herrick that Wilson was a good security director and that Anani did not believe Wilson had pulled a gun on Herrick. Anani said no action would be taken against Wilson. Herrick left and called the police.

Herrick told the police what had happened. The police went to Wilson's room and returned with a handgun. Herrick identified the gun as the one that was used on him. Herrick saw Wilson being led away in handcuffs.

Following the incident, Herrick was up the whole night in the bathroom; he had diarrhea and was throwing up. Even though Herrick was a large man, it did not mean anything "when you have a gun in [your] face." Herrick could not go to sleep and was just thankful he was alive. Herrick got a phone call that night from Anani pleading that Herrick forgive Wilson and stating Wilson was a good man.

Herrick found his attorney through the yellow pages; the attorney sent Herrick to Dr. Baculi. Dr. Baculi examined Herrick and gave him medication. Dr. Baculi sent Herrick's attorney a bill for about $200 or $300.

After the incident, Herrick's weight dropped from 235 pounds to around 200 pounds. He could not sleep, he was nervous all of the time, and thought he saw people. Herrick thought "he" was going to come after him. Even though Herrick moved to a different county he was nervous all of the time and could not sleep. He used to work out, and shoot baskets but at the time of trial he was not doing any of these things. At the time of trial, he still had nightmares every now and then, seeing a gun in his face and someone trying to shoot him.

Wilson testified that he was employed by Quality as security manager and had worked for Quality for four years. On occasion, Wilson had to advise Herrick regarding his job duties. On several occasions, Herrick reported to

work late. There was no policy at the hotel that tardiness was excused if you called in advance. On March 10, Herrick was still under his 90-day probation period and it was Wilson's intention to discharge Herrick as a result of his lateness and unexcused absences. Prior to March 10, Wilson thought he and Herrick got along pretty well.

Wilson testified that following the incident with a female employee, he "volunteered for an arrest" and rode in the front seat of the police car without handcuffs. He was thereafter released and no charges were filed against him. Wilson owned firearms but did not flaunt them about the hotel. At no time during the incident with Herrick did Wilson display a firearm or threaten to kill Herrick. During the meeting with Herrick and Anani, Herrick was upset that he had been let go and wanted his job back. After Anani refused to give Herrick his job back, Herrick threatened that unless he got his job back he would call the police and tell them that Wilson had pulled a gun on him. Police eventually came on to the property, searched Wilson's room and handcuffed Wilson. Wilson remained in custody for about two and a half days. He was never charged with a crime or prosecuted.

At time of trial, Wilson was a security manager, a promotion from director of security and an increase in duties and responsibilities. Wilson was bound by a document entitled "Employee Conduct Policy" which contained a rule making possession of weapons while on company premises or while performing duties grounds for dismissal.

Anani testified he was the general manager of the hotel and did not believe Wilson had ever threatened Herrick. If Anani ever had the slightest thought that Wilson had threatened Herrick, Anani would have terminated Wilson.

Following this first phase of the trial, the jury returned a special verdict that plaintiff had shown by a preponderance of the evidence that Wilson had threatened Herrick with a pistol; that Wilson was acting within the course and scope of his employment with Quality; that Wilson acted with the specific intent to cause injury to Herrick; that Herrick suffered severe emotional distress as a result of Wilson's actions; that Anani, the managerial employee of Quality, was informed that Wilson acted as described and ratified the act and that plaintiff had shown by clear and convincing evidence that the conduct of Quality was malicious, oppressive or fraudulent so as to justify imposition of damages for the sake of punishment and example. The jury found Quality liable to Herrick in the sum of $200 for medical expenses and $40,000 for pain and suffering.

A second phase of the trial was devoted to evidence solely on the issue of punitive damages during which time Anani was called as an adverse witness

pursuant to Evidence Code section 776. He testified that Comfort of California, Inc. (Comfort) was a company that owned three hotels, one in Anaheim, one in San Francisco and the subject Quality. Comfort was owned by Manor Care, a company with publicly exchanged stock on the New York Stock Exchange.

Anani was questioned by plaintiff regarding a travel exchange directory of Choice Hotels International which listed 2,800 properties including Quality. Anani testified these properties were just franchises of Choice and not owned by Choice. Any owner who wanted to buy a hotel and put a Choice name on it could do so for a fee and get a reservation service and name recognition. The net income for Quality was $300,000 and its gross assets were $3.9 million.

Anani testified he had no idea who would pay punitive damages if the jury awarded them, whether it would be Manor Care or Comfort, but he admitted his stated purpose was to testify "how poor [he was], . . . that [he] only [has] three hotels and . . . not making a nickel."

When Anani called back to Maryland for advice on how to proceed with the lawsuit, he spoke to Everett Casey, an attorney for Comfort. Manor Care subsequently provided the attorney.

Following this second phase, the jury returned a special verdict that Herrick was entitled to punitive damages in the amount of $150,000.

Thereafter the trial court denied Quality's motion for judgment notwithstanding the verdict and motion for new trial but reduced the award of punitive damages to $75,000 concluding that the jury's award of punitive damages was too high.

## EXCLUSIVITY OF WORKERS' COMPENSATION ACT

■ Quality contends the exclusive remedy for the emotional distress incurred lies in the workers' compensation system, that the exception to the exclusivity provision does not apply, and that the factual basis of the exception should have been tried to the jury.

Pursuant to Labor Code section 3602, subdivision (a), "Where the conditions of compensation set forth in Section 3600 concur, the right to recover such compensation is, except as specifically provided in this section and Sections 3706 and 4558, the sole and exclusive remedy of the employee or his or her dependents against the employer. . . ." Subdivision (b) of this

section, however, provides an exception to the exclusivity provision and reads: "An employee, or his or her dependents in the event of his or her death, may bring an action at law for damages against the employer, as if this division did not apply . . . (1) Where the employee's injury or death is proximately caused by a willful physical assault by the employer. . . ."

Quality contends that since the court refused to give the jury instructions on the law pertaining to the exclusivity of the workers' compensation system and exceptions thereto, the factual basis of applicability of the workers' compensation act was not decided by the jury. That contention is without merit. While the jury was not given the requested instructions, it specifically found in its special verdict form inter alia that Wilson had threatened Herrick with a pistol on the subject date, that Wilson was acting within the course and scope of his employment with Quality, that in doing the act described Wilson acted with the specific intent to cause injury to Herrick and that Herrick suffered severe emotional distress as a result of the act of Wilson. The jury's findings established as a matter of law the applicability of the exception to the workers' compensation act.

The jury's finding was tantamount to a finding that Herrick's injury was caused by a "willful physical assault." The jury specifically found that Wilson's actions were willful, done with the specific intent to cause injury to Herrick. (See *Soares* v. *City of Oakland* (1992) 9 Cal.App.4th 1822, 1825 [12 Cal.Rptr.2d 405].) Additionally, Wilson's threat to Herrick with a pistol was a physical assault within the meaning of Labor Code section 3602, subdivision (b)(1). In *Mathews* v. *Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 719 [100 Cal.Rptr. 301, 493 P.2d 1165], our high court construed similar language and concluded that physical aggressor meant one who engaged in physical conduct which a reasonable person would perceive to be a real, present and apparent threat of bodily harm, that it was not necessary that there be a battery before one could be deemed a physical aggressor, that bodily contact was not a significant factor, that the act need not actually cause physical harm, and that throwing a punch or shooting a gun was not necessary. " '. . . Under appropriate circumstances, clenching a fist or aiming a gun may be sufficient to convey a real, present and apparent threat of physical injury.' [Citation.]" (*Iverson* v. *Atlas Pacific Engineering* (1983) 143 Cal.App.3d 219, 225 [191 Cal.Rptr. 696].) Similarly bodily contact is not necessary for a physical assault.

Additionally, contrary to Quality's contention, there was sufficient evidence to support the jury's finding that Wilson intended to cause injury when he pointed a gun at Herrick's head and threatened to blow his head off.

### EVIDENCE OF RATIFICATION

■ Contrary to Quality's assertion, there was evidence that Anani, Wilson's supervisor and the manager of Quality Hotel, ratified Wilson's conduct. While Anani testified he had no reason to believe Herrick's charges against Wilson, the record establishes that Anani was aware that Wilson possessed guns on the hotel premises in violation of the employer's policy and that Anani was present when Wilson had been arrested previously for a physical assault on another employee. Additionally, the record establishes that Herrick told Anani that Wilson had threatened Herrick with a gun and that Anani telephoned Herrick in the early morning begging Herrick to forgive Wilson, stating Wilson had made a mistake and he was a good man. The record also establishes that Anani had the sole authority within the hotel to fire hotel employees and that sometime following the incident, Wilson received a promotion. (See *Sandoval* v. *Southern Cal. Enterprises, Inc.* (1950) 98 Cal.App.2d 240, 250 [219 P.2d 928].)

### EVIDENCE OF SPECIAL DAMAGES

Quality contends the award of $200 as special damages is not supported by the record in that there was no evidence that the doctor treating Herrick submitted a bill in that amount. While it appears that counsel for Quality initially did not know about a stipulation relative to the doctor's bill, the record establishes that counsel for Quality subsequently agreed to the stipulation, noting however that Herrick had testified he had never seen the bill.

### GENERAL DAMAGES

■ Quality Hotel contends the award of $40,000 was excessive and unsupported by the evidence. ■ "Emotional distress damages are properly recoverable if proximately caused by the tortious conduct of a defendant. [Citations.]" (*Washington* v. *Farlice* (1991) 1 Cal.App.4th 766, 772 [2 Cal.Rptr.2d 607].) ■ Herrick testified that at the time of the incident he thought he was going to be killed. Following the incident he suffered from nightmares, weight loss, diarrhea, insomnia and vomiting. He believed he might be stalked and changed his place of residence, but was still nervous. The jury was properly instructed regarding damages for emotional distress, that it should award damages in an amount that would reasonably compensate Herrick for all damages legally caused by defendant's conduct, and that Herrick should be reasonably compensated for fears, anxiety and other emotional distress he suffered and for similar suffering reasonably certain to be experienced in the future. The jury was also instructed that in making its award it was to exercise its authority with calm and reasonable

judgment. The jury's award of general damages is supported by the evidence and does not appear to be grossly disproportionate given the facts and circumstances and will not be disturbed on appeal. (*Ibid.*)

### PUNITIVE DAMAGES

During the second phase of trial on the issue of punitive damages, Anani testified that Comfort was a company that owned three hotels, one in Anaheim, one in San Francisco and the subject Quality. Comfort was owned by Manor Care, a company with publicly exchanged stock on the New York Stock Exchange. Anani did not know what Manor Care's income was or how much stock had been issued. Manor Care owns other hotels. The net income of Quality for the last fiscal year was approximately $300,000 and its gross assets were $3.9 million. The award of punitive damages as reduced by the trial court was not excessive and was supported by the evidence.

### EVIDENCE OF WILSON'S PRIOR ARREST

Quality contends the court committed reversible error in admitting evidence that Wilson was arrested as a result of the alleged incident and arrested on a prior occasion as a result of an altercation with another employee. This contention is without merit. The jury was advised that evidence that Wilson had been arrested was not to be considered in deciding whether in fact the incident took place. Further, Wilson testified no charges were ever filed against him for the subject incident. Wilson testified regarding the circumstances of the prior occasion when he was taken into custody and that both parties to the altercation volunteered to go down to the police station, that Wilson sat without handcuffs in the front seat of the patrol car and that no charges were ever filed against him. There was no prejudice in the admission of this evidence.

### MISCONDUCT

Quality contends that misconduct during the punitive damages phase of the trial was plain and prejudicial error and the trial court erred in not granting a new trial based on that ground. The contention is without merit. It does not appear that the verdict rested in any part on the asserted claims of misconduct and any claim that damages were excessive was rectified by court's reduction of punitive damages awarded. It does not appear that the conclusion of the trial court to deny the motion for new trial was an abuse of discretion and its decision will not be disturbed on appeal. (See *Johns* v. *City of Los Angeles* (1978) 78 Cal.App.3d 983, 987-990 [144 Cal.Rptr. 629].)

### HERRICK'S APPEAL

The contention that the court erred in reducing the award of Herrick's punitive damages is without merit. "In any civil action where after

trial by jury an order granting a new trial limited to the issue of damages would be proper, the trial court may in its discretion: . . . (b) If the ground for granting a new trial is excessive damages, make its order granting the new trial subject to the condition that the motion for a new trial is denied if the party in whose favor the verdict has been rendered consents to a reduction of so much thereof as the court in its independent judgment determines from the evidence to be fair and reasonable." (Code Civ. Proc., § 662.5.)

Contrary to Herrick's assertion, he did not establish by reference to a vacation and travel directory that listed 2,800 hotels, the fact that Quality was one of 2,800 hotels owned by Choice Hotels. The directory itself stated that the properties listed in the directory were independently owned and operated under a franchise agreement with Choice Hotels International. There was no evidence in the record which would establish that a decision on Quality's financial condition should be based on the 2,800 properties listed in the directory. We cannot say the court abused its discretion in reducing the award of punitive damages to an amount the court determined to be fair and reasonable.

### SANCTIONS

We do not deem Herrick's appeal to be frivolous within the meaning of *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179]), and decline to award sanctions. (See *Miller* v. *National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 343-345 [126 Cal.Rptr. 731].)

### DISPOSITION

The judgment is affirmed.

Johnson, J., and Woods (Fred), J., concurred.

The petition of defendants and appellants for review by the Supreme Court was denied January 20, 1994. Panelli, J., was of the opinion that the petition should be granted.