Filed 2/23/15  In re D.C. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re D.C., a Person Coming Under the Juvenile Court Law. | D066544 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J511883E) |
| v. | |
| D. C. et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Patti L. Dikes, under appointment by the Court of Appeal, for Defendant and Appellant D.C.

Law Offices of Christopher R. Booth and Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant Michael C.

Office of the County Counsel, Thomas E. Montgomery, County Counsel, John E. Phillips, Chief Deputy County Counsel, and Erica R. Cortez, Deputy County Counsel, for Plaintiff and Respondent.

I.

INTRODUCTION

D.C. (Mother) appeals an order under Welfare and Institutions Code[1] section 366.26 selecting adoption as the permanent plan for her daughter D.C. and terminating her parental rights.[2] Mother also appeals an order denying her petition under section 388 seeking either the return of D.C. to her custody or a permanent plan of legal guardianship. Mother contends that (1) the court should have granted her section 388 petition because the evidence showed that her circumstances had changed and that it would be in D.C.'s best interests to grant the petition; and (2) the court erred in finding that there was not a beneficial parent-child relationship between her and D.C. within the meaning of section 366.26, subdivision (c)(1)(B)(i) that precluded the termination of her parental rights. We affirm both orders.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2] To avoid confusion, we refer to appellant as "Mother" because she has the same initials as her daughter, D.C.

II.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2012, the San Diego County Health and Human Services Agency (the Agency) filed a petition on behalf of then two-year-old D.C. that included two counts under section 300, subdivision (b)(1).[3] The first count alleged that Mother had been unable to find affordable housing for D.C., and had failed to avail herself of emergency shelter. The second count alleged that Mother left D.C. "inadequately attended and inadequately supervised in that there [had] been multiple reports of excessive discipline of [D.C.] or [her] sibling as well as reports of [D.C.] running in the street unsupervised . . . ." The petition identified Michael C. as D.C.'s alleged father[4] and

_____

[3] Effective June 20, 2014, after the Agency filed the petition, subdivision (b) of section 300 was redesignated subdivision (b)(1). (Stats. 2014, ch. 29, § 64.) Subdivision (b)(1) provides, in relevant part, that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse."

[4] Counsel for Michael C. filed a letter stating that Michael "joined in mother's arguments below and does so on appeal."

3

stated that the Agency had filed a similar petition on behalf of D.C.'s four-year-old half-brother Jason C.[5]

Law enforcement personnel took D.C. and Jason (the children) into protective custody on April 22, 2012 after Mother was seen yelling at them, yanking each of them by the arm, and slapping D.C. across the face. The children were filthy and D.C. had urinated on herself and was visibly wet. An officer who contacted Mother reported that Mother did not realize that D.C. had wet herself. Mother had been evicted from her apartment on April 1 and had been living with friends since then. She had no plan for housing. The Agency had received a report two weeks earlier that the children were playing outside unsupervised, and had played in a busy street where they were at risk of being struck by cars. The children reportedly never wore shoes and always appeared dirty. They ate food outside on the dirty ground and played in trash from two nearby overflowing dumpsters.

The Agency's detention report noted concerns about Mother's extensive child welfare history. The Agency had previously filed a dependency petition on behalf of Jason in 2008. In that case, the Agency reported that Mother had an extensive history with Child Protective Services (CPS) going back to 1997 that included allegations that she had been unable to provide for her other children due to her mental health and drug and alcohol abuse. Based on her review of Mother's child welfare history, the social

---

[5]     The juvenile court terminated parental rights in Jason's dependency case and this court filed an opinion on November 25, 2014 affirming the termination order. (*In re J.C.* (Nov. 25, 2014, D065662) [nonpub. opn.].)

4

worker who prepared the detention report in the present case concluded that Mother "continues to demonstrate a pattern, whereby, when there is mandatory child welfare intervention in her life, she is capable of following recommendations, even gaining some insight into how her mental illness and propensity to self-medicate with drugs and/or alcohol, negatively influences her life. However, . . . [M]other [loses] her motivation and focus to apply the skills that she had acquired during the times of Agency [i]nvolvement, once she is left to provide a stable environment for herself and [her] children . . . ."

In a telephone interview with the social worker, Mother said that she had a therapist but had not seen him in about three months. She also saw a psychiatrist and took medications for anxiety and depression. She still had her anxiety medication but did not have her depression medication because she left it in the cupboard when she was evicted, and it had been a few months since she had seen her psychiatrist.

At the detention hearing on April 26, 2012, the juvenile court found that a prima facie showing had been made on D.C.'s petition. The court detained D.C. in foster care and ordered supervised visitation for Mother.

In its jurisdiction/disposition report, the Agency noted that D.C. and Jason were detained together in a licensed foster home. The foster mother reported that they were wonderful children who had fun playing and got along well with the foster mother's three-and-a-half-year-old son. However, both children cried in their sleep. Mother had not visited the children or contacted the social worker to inquire about visitation since the children's detention.

5

The social worker reported that Mother had a long history of substance abuse and mental health problems. She had been diagnosed with psychosis and compulsive personality traits, and she reported that she suffered from depression, anxiety, and schizophrenia. However, she had not consistently maintained appointments with her psychiatrist or therapist and was not taking prescribed medication. The social worker concluded that Mother was neglecting her children's needs as a result of her failure to meet her own mental health needs. In an addendum report, the social worker noted that Mother had failed to show for an on-demand drug test. The Agency viewed her failure to show as a positive test for drug use.

At a hearing on June 21, 2012 that Mother attended with counsel, the court sustained D.C.'s petition, declared D.C. a dependent of the court, and removed her from the parents' custody. The court ordered reunification services and supervised visitation for the parents, and ordered Mother to undergo a psychological evaluation. The court granted minor's counsel's request for a court-appointed special advocate referral.

The Agency's status review report for the six-month review hearing noted that D.C. and Jason had three older half-siblings who had been removed from Mother's custody due to neglect. Mother failed to reunify with those minors and they were placed with their father until he passed away. The minors currently were being cared for by the maternal grandmother. D.C. and Jason had adjusted well to living in their foster home and got along well with the other children in the home. Both children had nightmares, but less frequently than when they first arrived in the home. The foster mother believed

6

that therapy had helped the children. The foster parents were interested in adopting D.C. and Jason if the parents did not reunify with the children.

The Agency reported that Mother had made minimal progress on her case plan. Her psychological evaluation had been delayed because she frequently changed her phone number and the Agency was unable to contact her. The Agency asked Mother to submit to on-demand drug testing when the social worker requested it. She failed to show for two tests and the results of two other tests were negative. She attended only nine out of 17 scheduled visits with the children that the foster mother facilitated, cancelling one visit and failing to show for seven other visits.

The Agency noted that this was Mother's third reunification case. In her first case, she failed to reunify with the older children. In the second case, it took her 18 months to reunify with Jason and the court ultimately terminated jurisdiction. Five months later, however, Mother required Agency intervention in the form of voluntary services. Mother did not cooperate with the voluntary services and the case closed because it exceeded the "time limit."[6] Ten months after the voluntary case closed, the Agency initiated the

---

[6] The referenced "time limit" is presumably the six-month limit for voluntary services under section 301, which incorporates the time limits under sections 16506 and 16507.3. Section 16506 provides for family maintenance services for the purpose of maintaining a child in his or her own home. Those services are "limited to six months, and may be extended in periods of six-month increments if it can be shown that the objectives of the service plan can be achieved within the extended time periods, and provided within the county's allocation." Section 16507.3, subdivision (a) provides that "[s]ubject to the availability of federal funding, voluntary placement services for federally eligible children may be extended for an additional six months, for a total period not to exceed 12 months for [families meeting specified criteria]."

present case. Mother had made minimal progress in the present case because she had not fully participated in services and had failed to provide contact information to the Agency. She reported that she suffered from depression, anxiety, and schizophrenia, but the Agency was unable to assess her mental health needs because she had only recently completed her psychological evaluation and failed to provide contact information for her psychiatrist.

In an addendum report, the Agency stated that Mother had attended eight of 13 therapy sessions. The therapist twice terminated the therapy for poor attendance, but allowed Mother to resume therapy on the condition that she actively participate. Mother had undergone a psychological evaluation, but the evaluator's written report was not yet completed. The evaluator orally reported that Mother had chronic mental health issues and that she self-medicated with drugs. Her history raised the concern that "she has not been able to sustain changes." The evaluator noted that "[s]he has a cycle-structure of pulling it together when the Agency is involved but once the Agency structure is lifted, she sinks back down."

At the six-month review hearing, the court found that Mother had made some progress with her case plan and ordered the Agency to continue to provide her services. The court continued D.C.'s placement in the foster home.

The Agency's status review report for the 12-month review hearing stated that Mother was living alone in a one-bedroom apartment. She was unemployed but received monthly social security benefits. Her visitation with D.C. and Jason had been sporadic.

8

Between January 1 and April 30, 2013, Mother cancelled or failed to appear for eight of 18 scheduled visits and was late to two visits. The children became visibly upset when Mother did not show up for a visit.

Mother's participation in individual therapy was also sporadic. As of April 12, 2013, she had attended 15 therapy sessions and missed 19. Mother's therapist told the social worker that Mother was "still 'all over the place' " and needed to attend weekly sessions.

Mother was ordered to complete a substance abuse assessment and obtain a referral for substance abuse services. She failed to complete the assessment, however, and had not yet begun participation in substance abuse treatment. She also failed to adequately verify her compliance with an order to attend at least three Narcotics Anonymous (NA) or Alcoholics Anonymous meetings per week. She provided the social worker with attendance logs that contained signatures, but the Agency was concerned that "these signatures and logs may not be valid as there are no stamps, [there is] similar handwriting throughout, the same people signing them throughout, with the same pen ink used throughout the majority of the logs." Mother failed to appear for two of four on-demand drug tests. Her results from the other two tests were negative.

The court-appointed special advocate, Karen Van Riper, also filed a report for the 12-month review hearing. Van Riper reported that Mother had a history of 39 prior CPS referrals, 13 of which involved D.C. or Jason. The referrals included many substantiated

9

allegations of severe and general neglect, emotional and physical abuse, and abuse of a sibling. Mother had been convicted of willful cruelty to a child in 1997.

Van Riper described D.C. as "an affectionate, generous, and inquisitive three-year-old girl." D.C. and Jason both interacted comfortably and happily with their foster mother and her four-year-old son, and the foster mother treated all three children equally. Van Riper observed "appropriate, affectionate, and familial interactions between the foster mother and all three children." She noted that D.C. and Jason "have a close, loving relationship with each other and play extremely well together."

Van Riper reported that Mother was currently allowed one supervised visit with the children per week. Before May 2013, the foster mother had supervised the visits. The supervised visitation was moved to a family visitation center because it became increasingly difficult for the foster mother to effectively supervise Mother, in part because Mother engaged in inappropriate behavior. Mother called D.C "stupid" and slapped her face during a visit, and told the children that they would be coming to live with her and her boyfriend soon, although there was no basis for her to believe that this was true. Mother failed to attend two visits in May 2013 and was generally difficult to contact. She was inconsistent with the visitation schedule, and sometimes raised her voice when speaking to the foster mother on the phone.

Van Riper intended to observe nine scheduled visits between Mother and the children, but Mother attended only four of the visits. Mother arrived 45 minutes late for one of the visits and visited the children for only 15 minutes. She left another scheduled

two-hour visit after only one hour. Since Van Riper's appointment to the case, Mother had failed to attend seven scheduled visits. When she was late or failed to attend a visit, the children asked where she was and why she was not coming. They did not cry or become visibly upset, but the foster mother reported that they acted out immediately after such incidents. When Mother visited the children, D.C. greeted her with more enthusiasm than Jason did. At playground visits, Jason spent most of the time playing on the playground and Mother did not often play with him. She spent most of the time with D.C. There was not much conversation between Mother and D.C., but there was more than between Mother and Jason.

Van Riper's assessment was that D.C. and Jason were "sweet, well-behaved children who are comfortable and content in their current foster home." The children loved each other and had a close sibling relationship, and Van Riper believed that they should remain together in their current placement. The foster family had "forged a loving connection with both children, and [was] considering adopting them if reunification [was] not possible." Van Riper concluded that it would not be in D.C.'s best interest to be returned to Mother. Mother's visitation had been inconsistent and Van Riper believed the children became "stressed, confused, and disappointed when their mother is late or does not show up for visits or makes statements to the children about their imminent return to her home when that does not appear to be the case." At times it appeared to Van Riper that the children's visitation with Mother was "doing more harm than good." Van Riper

11

recommended that reunification services be terminated and that the court set a section 366.26 hearing to determine the permanent plan for the children.

D.C.'s father, Michael C., made his first court appearance in the case on June 18, 2013, the date originally set for the 12-month review hearing, and the court found that he was a presumed father. The court appointed a guardian ad litem and counsel to represent Michael and ordered that he be provided supervised visitation in a therapeutic setting and voluntary referrals. The social worker later discovered that Michael had not had any contact with D.C. since 2010, when the court issued a restraining order protecting Mother and the children from him after a domestic violence incident. Because the restraining order was in effect until October 1, 2013, any visitation between Michael and D.C. before that date would violate the restraining order. The court suspended Michael's visitation on August 26, 2013.

On July 22, Michael filed a section 388 petition based on his lack of notice of the dependency case. He asked the court to set the matter for a new disposition hearing and provide him with reunification services. The court set the matter for hearing. In a minute order dated September 9, 2013, the court noted: "All counsel have reached a resolution as to [Michael's] [section] 388 [petition]. [¶] The agreement is to revert the case to the original disposition and to offer [Michael] six months of family reunification services." Based on that agreement, the court reverted the case to disposition as to Michael and authorized six months of reunification services for him.

12

The Agency filed an addendum report in July 2013 in which it noted that Mother's visitation with the children continued to be sporadic, with multiple cancellations and "no shows." As a result, Mother was discharged from the visitation center on July 26, 2013. Mother had recently been engaged in substance abuse treatment, but had missed three group sessions that month. She claimed that she missed the sessions because of an illness and a knee injury, but had not provided any medical documentation to verify the reasons for her absences.

In an addendum report dated September 9, 2013, the social worker stated that she had not heard from Mother since the last court hearing on August 26. The social worker thought this was unusual because Mother had previously been calling her weekly. Mother arrived late to a scheduled visit with the children on August 23 and appeared disheveled and thinner than usual. It appeared to the social worker that she may have been under the influence of drugs or recovering from a drug binge. On September 5, the director of Mother's substance abuse program told the social worker that Mother had tested positive for methamphetamine on August 20, and had not returned to the program since being informed of her positive result on August 27. Consequently, she had missed three treatment group sessions.

At the 12-month review hearing on September 23, 2013, the court found that Mother had not made substantial progress with her case plan and terminated her reunification services. The court continued D.C.'s foster placement and set a six-month review hearing to assess Michael's progress toward reunification.

13

In an addendum report dated October 17, 2013, the Agency stated that D.C. and Jason's foster parent had given a 60-day notice on September 30 and that the Agency would have to find "a concurrent/adoptive-foster home for [D.C. and Jason]." The Agency also reported that Michael had sent the previous social worker assigned to the case an e-mail in which he threatened to kill "lawyers, thearpists [*sic*] and judicial members" because he was not getting visitation with D.C. The e-mail resulted in Michael's being arrested and charged with making a criminal threat (Pen. Code, § 422) and related offenses.

In an addendum report filed in November 2013, the Agency asked the court to suspend Michael's contacts with D.C. due to his extensive criminal history, hostile behavior, and mental health history. The report included a letter from D.C.'s therapist in which the therapist stated, "Transitions appear particularly challenging for [D.C.]. The foster mother reports a significant increase in both acting out behavior and anxiety after [D.C.] has visitation with her biological mother."

In December 2013, the Agency placed D.C. and Jason together in the home of a confidential nonrelative extended family member (NREFM). The children's new caregiver expressed interest in having the children permanently placed with her.

In a status review report filed in February 2014, the Agency recommended that the court terminate reunification services for Michael and set a section 366.26 hearing to establish a permanent plan for D.C. The Agency reported that Mother had visited the children only twice since her reunification services were terminated in September 2013,

14

and that she "often appear[ed] to be more a passive observer, merely watching her children play together." She appeared uninterested in or incapable of setting boundaries with the children, and "the supervising social worker had to intervene when the children would get too hyper and attempt to run out of the room." Van Riper observed a visit between Mother and the children in January 2014 and reported that Mother did not initiate much conversation with the children and frequently asked what time it was. The children appeared to be "relaxed and happy" in their new placement and their caregiver had "expressed a desire to adopt both children."

Michael filed a second section 388 petition on March 18, 2014 asking the court to change the order suspending his visitation rights, allow him to have telephonic visitation with D.C., and allow undelivered letters that he had written to D.C. to be presented to her. The court found "a prima facie as to [Michael's section] 388 [petition]" and set the matter for hearing with the contested six-month review hearing on March 26, 2014. At the hearing on March 26, the court denied Michael's section 388 petition and proceeded with the six-month review hearing. The court terminated Michael's reunification services, continued D.C.'s placement with the NREFM, and set a section 366.26 hearing.

Social worker Emre Iscan prepared the Agency's assessment report for the section 366.26 hearing. Iscan was assigned to D.C.'s case in April 2014, but had had extensive contact with D.C. before then because she had been assigned to Jason's case in October 2013. Her report revealed that the children's current caregiver was Jason's paternal grandmother.

15

Iscan observed 11 visits between Mother and the children between mid-December 2013 and early July 2014. She reported that "the visits appeared positive and the children appeared to have fun playing and interacting in the birth mother's presence; the birth mother brought toys, snacks and treats to every single visit which contributed to the children's level of excitement; the birth mother appeared to be more so of a passive observer, and acted in the role of a familiar adult the children would be comfortable interacting with." The children did not show any adverse reaction to parting with Mother after the visits, and their caregiver did not report any changes in their behavior after visits. The children did not ask to see Mother between visits and Mother had not requested phone contact with them between visits. The children had started calling their caregiver "mom" instead of "grandma." The caregiver continued to express her commitment to adopting both children and preserving their close sibling relationship.

Iscan's assessment was that D.C. deserved to be adopted and grow up in a loving home where she could preserve her close bond with Jason. D.C. was "healthy, happy and thriving in her current prospective adoptive home," and had stated that she wanted to live in the home "forever." The Agency recommended that the court terminate the parental rights of Mother and Michael and order a permanent plan of adoption for D.C.

Mother filed a section 388 petition on August 7, 2014 asking the court to place D.C. with her or order a permanent plan of legal guardianship. The petition alleged that Mother had been participating in the McAlister Institute outpatient program since March 17, 2014 and was living in a sober living facility; she had been attending NA meetings

16

regularly since February 2014 and had a sponsor; she had completed a parenting course; she was attending her twice-monthly visits with D.C.; and she was under the care of a psychiatrist and was taking her prescribed medication. The petition stated that returning D.C. to her custody "would be in the child's best interest because it would allow her to be raised by her biological mother, who is now capable of providing a safe and stable home. Legal guardianship would also assure that Mother would remain in the child's life and would allow her to reunify when appropriate."

The court held a contested hearing on Mother's section 388 petition and contested section 366.26 hearing on August 12, 2014. The court received into evidence the section 388 petition and attachments, Iscan's assessment report and an addendum report for the section 366.26 hearing, and Iscan's curriculum vitae. Mother and Iscan testified at the hearing. The court denied Mother's section 388 petition based on its findings that Mother had not shown a sufficient change of circumstances to warrant granting the petition, and that it would not be in D.C.'s best interests to be placed with Mother. After hearing argument on the section 366.26 issues, the court found by clear and convincing evidence that D.C. was likely to be adopted and that none of the circumstances specified in section 366.26, subdivision (c)(1)(B) that would make termination of parental rights detrimental to D.C. existed. The court terminated parental rights and referred D.C. to the Agency for adoptive placement.

17

A.      *Section 388 Petition*

Mother contends that the court should have granted her section 388 petition because she showed her circumstances had changed and returning D.C. to her would be in her best interests.  Section 388 provides that "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

In ruling on a section 388 petition, the court must consider whether the requested relief is in the child's best interests.  (*In re Jasmon O*. (1994) 8 Cal.4th 398, 415.)  We review the juvenile court's determination for an abuse of discretion and will not disturb that determination "'"unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' [Citations.]"  (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318.)

In deciding whether a denial of a section 388 petition was an abuse of discretion, we bear in mind that after the termination of reunification services, a parent's "interest in the care, custody and companionship of the child [is] no longer paramount.  Rather, at this point, 'the focus shifts to the needs of the child for permanency and stability'

18

[citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interest of the child." (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.)  Accordingly, "[t]he court need not continue to consider the issue of reunification at the section 366.26 hearing.  The burden thereafter is on the parent to prove changed circumstances pursuant to section 388 to revive the reunification issue." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

In considering the merits of section 388 petitions on the ground of changed circumstances, courts distinguish between *changed* circumstances and merely *changing* circumstances.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47, 49.)  Granting such a petition results in delay of "the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point . . . ." (*Id.* at p. 47.)  To grant such a petition on a showing of merely changing circumstances "does not promote stability for the child or the child's best interests.  [Citation.]  ' "[C]hildhood does not wait for the parent to become adequate." ' " (*Ibid.*)

Although we review the court's decision on a section 388 petition for abuse of discretion, the practical differences between this standard of review and the substantial evidence standard are not significant.  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)  " '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . .  Broad deference must be shown to the trial judge.  The reviewing court should interfere only " 'if [it] find[s] that

19

under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' . . ." ' [Citations.]" (*Ibid.*) In other words, there is no abuse of discretion when the factual findings underlying the court's exercise of discretion are supported by substantial evidence. (See *People v. Cluff* (2001) 87 Cal.App.4th 991, 998 ["A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence"]; *Johns v. City of Los Angeles* (1978) 78 Cal.App.3d 983, 990 [abuse of discretion to order a new trial based on juror misconduct if no substantial evidence supports a finding of bias]; *West v. Lind* (1960) 186 Cal.App.2d 563, 566 [discretion to order preliminary injunction upheld if factual determinations are supported by substantial evidence]; *In re John F.* (1994) 27 Cal.App.4th 1365, 1375-1376 [petitioner's burden on section 388 petition is to show by a preponderance of the evidence that modification of the order promotes the child's best interests].)

The court's denial of Mother's section 388 petition was not an abuse of discretion because substantial evidence supports the court's findings that Mother's circumstances had not sufficiently changed and that the return of D.C. to Mother's custody was not in D.C.'s best interests. D.C. was two years old when she was removed from Mother's custody and was five years old when Mother filed her section 388 petition. For the first two years of D.C.'s dependency case, which amounted to half of D.C.'s life, Mother's visitation with her was sporadic with multiple cancellations and "no shows." Mother visited the children only twice between the termination of her reunification services in

20

September 2013 and the filing of the Agency's status review report in February 2014. Social worker Iscan reported that from mid-December 2013 to early July 2014, "[Mother's] visits appeared positive and the children appeared to have fun playing and interacting in the birth mother's presence[,]" but Mother "appeared to be more of a passive observer . . . ." Although D.C. and Jason referred to her as "mom," Mother "did not appear to stand in a parental role and appeared more so on par with an aunt or familiar adult." The children did not show any adverse reaction to parting with Mother after the visits. D.C. was "healthy, happy and thriving in her current prospective adoptive home[,]" and had stated that she wanted to live in the home "forever." She had started calling her caregiver "mom" and the caregiver expressed commitment to adopting both Jason and D.C. and preserving their close sibling relationship.

Based on the social worker's assessment of Mother's visitation and the evidence that D.C. was thriving in her prospective adoptive placement, the court could reasonably find that it was not in D.C.'s best interest to be removed from her current placement and returned to Mother's custody.

The court could also reasonably find that returning D.C. to Mother's custody would not be in her best interests because it would separate her from her brother Jason, with whom she was closely bonded. In its oral ruling denying Mother's section 388 petition, the court found that it was "not in the best interest of [D.C.] to be removed from, as all parties conceded, a solid sibling set, solid sibling bond . . . ." Substantial evidence supports that finding. D.C. had lived with Jason her entire life. In a report filed in

February 2014, Van Riper observed, "[D.C.] is very close to her brother Jason. I am thankful that Jason and [D.C.] could be placed together. To this point, their lives have been so fraught with uncertainty and instability that it appears they only have each other to depend on."

At the contested hearing on Mother's section 388 petition, Iscan testified that she objected to returning D.C. to Mother's custody in large part because of D.C.'s strong bond with Jason. Iscan stated, "I can say with confidence that based on the visitation I observed, the home visits I conducted, this is the most bonded sibling set I have encountered thus far in my career, and I feel that it would be to [D.C.]'s detriment to remove her from that setting and [place her] back with [Mother]." The court was entitled to find Iscan's opinion credible and to give great weight to her assessment. (*In re Casey D., supra,* 70 Cal.App.4th at p. 53.)

Mother herself testified that she felt that it was good for D.C. and Jason to "remain as a sibling set." She stated that the children "have been able to support each other . . . since their removal. They're like two peas in a pod. I feel that Jason is going to thrive being that [he is placed with] his paternal family. And I think that [D.C.] is going to do as well because . . . she can grow up knowing that at least that it's somewhat her family." The evidence strongly supports the court's finding that separating D.C. from Jason and returning her to Mother's custody would not be in D.C.'s best interests.

Further, in its oral ruling, the court observed that Mother's "circumstances have not changed[,] . . . they are changing." The court acknowledged that Mother was

22

attending an outpatient program and was living in a sober living facility, and that she was in the process of obtaining Section 8 housing.[7] The court noted Mother's testimony that, in the court's words, "she likes the support and stability of sober living. It's where she needs to be until she is sure that she has made it through this process and she is not at a risk to relapse.[8] I think that statement is very probative of the place that mother is in at this point. She is attending outpatient treatment. She is living in sober living, and she is working on . . . a drug addiction that has taken the entirety of her adult life. And she has a lot remaining to work on with respect to her own stability and her own ability to find housing in a safe and secure environment for these two children."

The court reasonably viewed Mother's relatively recent commitment to sobriety as a work in progress that showed *changing*, but not *changed*, circumstances. In the words of the Court of Appeal in *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223, Mother's "completion of a drug treatment program, at this late a date, though commendable, is not a substantial change of circumstances." (*See In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer

---

7       "Section 8 is a federal program providing financial assistance to low-income tenants and is codified as 42 U.S.C. [section] 1437f." (*Roldan v. Callahan & Blaine* (2013) 219 Cal.App.4th 87, 90.)

8       The court presumably was referring to the following portion of Mother's testimony: "Right now at the moment I like the stability of sober living because of the positive support, and stuff like that. But I'm free to move and get an apartment any time. Just right now I feel that that's where I need to be until I'm sure of, you know, that . . . I made it through this process, you know, in a healthy manner that, you know, I'm not putting myself in danger or at risk of relapsing or anything."

period than 120 days to show real reform."]; *In re Clifton B.* (2000) 81 Cal.App.4th 415, 423-424 [200 days of sobriety was not enough to reassure the juvenile court that the father's most recent relapse would be his last]; *In re Mary G.* (2007) 151 Cal.App.4th 184, 206 [court could reasonably find sobriety between March and hearing date in June was not particularly compelling given the severity of mother's drug problem].)  In the Agency's assessment report for the section 366.26 hearing, Iscan stated the following regarding Mother's current participation in an outpatient drug treatment program and her residence in a sober living facility:  "While the Agency commends the birth mother for making positive changes in her life, these changes have only been demonstrated in the previous few months.  This would be considered as a very small window of time, in contrast to the birth mother's longstanding history of polysubstance abuse stemming back to 1996."

The evidence sufficiently supports the court's finding that Mother's circumstances were changing, but had not changed within the meaning of section 388.  The court did not abuse its discretion in denying Mother's section 388 petition.

B.      *Termination of Parental Rights*

Mother contends that the court erred in finding that the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(B)(i), did not apply to preclude the termination of parental rights.  " 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.]  If the dependent child is adoptable, there is a strong preference for adoption

24

over the alternative permanency plans.' [Citation.] 'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). [Citations.] Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." ' " (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1165.)

This court has interpreted "the 'benefit from continuing the [parent[-]child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

"A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence. [Citation.] It is not enough to show that the parent and child have a friendly and loving relationship. [Citation.] ' "Interaction between [a] natural parent and child will always confer some incidental benefit to the

25

child. . . ." ' [Citation.] For the exception to apply, 'a *parental* relationship is necessary[.]' [Citation.] ' "While friendships are important, a child needs at least one parent. Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent. " ' " (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.)

We apply the substantial evidence standard of review to the factual issue of whether there is a beneficial parental-child relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination of parental rights would be detrimental to the child. (*In re J.C., supra,* 226 Cal.App.4th at pp. 530-531; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) The latter determination " ' "calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption . . . ." ' " (*In re J.C.*, *supra*, at p. 531.)

We conclude that Mother has not met her burden of establishing that the beneficial relationship exception to adoption applies. The beneficial relationship exception requires the parent to have "maintained *regular visitation and contact with the child . . . .*" (§ 366.26, subd. (c)(1)(B)(i), italics added.) As noted, Mother's visitation throughout most of the dependency case was sporadic, with many cancellations, "no shows," and late appearances. Mother did not begin to consistently attend scheduled visits with D.C. until two years after D.C.'s removal and approximately four months before the section 366.26

26

hearing. As of the time of the hearing, Mother's visitation remained supervised and was limited to two visits per month. Thus, the court could reasonably find the absence of a beneficial parent-child relationship based solely on Mother's failure to meet the statutory requirement of maintaining regular visitation and contact.

Although there was evidence that D.C. enjoyed Mother's visits and had positive interaction with Mother during the visits, the evidence did not show that Mother's relationship with D.C. was the type of *parental* relationship required to preclude the termination of her parental rights. (*In re J.C., supra,* 226 Cal.App.4th at p. 529.) The court could reasonably conclude that Mother's visitation with D.C. had been too sporadic and inconsistent throughout most of the dependency case to enable her to establish a parental relationship with D.C. As noted, Iscan reported that when Mother did visit D.C., she appeared to be a passive observer who did not assume a parental role, but rather, acted in the role of an aunt or any familiar adult with whom D.C. would comfortably interact, and D.C. did not show any adverse reaction to parting with Mother after the visits.

At the time of the section 366.26 hearing, the evidence showed that D.C. was happy and thriving in a secure prospective adoptive home where she could preserve her close bond with her brother Jason, and where she said she wanted to live "forever." Although D.C. appeared to enjoy visiting Mother, the evidence did not show that her relationship with Mother promoted her well-being "to such a degree as to outweigh the well-being [she] would gain in a permanent home with [her] new, adoptive [parent]." (*In*

27

*re Autumn H., supra,* 27 Cal.App.4th at p. 575.)  Mother has not shown that the court erred in terminating her parental rights.

IV.

DISPOSITION

The order denying Mother's section 388 petition is affirmed.  The order selecting adoption as the permanent plan for D.C. and terminating parental rights is affirmed.

_____<br>AARON, J.

WE CONCUR:

_____
HUFFMAN, Acting P. J.

_____
HALLER, J.