Filed 4/28/16  In re Bella P. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


In re BELLA P., a Person Coming Under the Juvenile Court Law.

---

SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,

     Plaintiff and Respondent,

     v.

LUIS P.,

     Defendant and Appellant.

D069376

(Super. Ct. No. NJ14907)


APPEAL from orders of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.


Elena S. Min, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Luis P. appeals an order under Welfare and Institutions Code section 366.26[1] selecting adoption as the permanent plan for his daughter Bella P. and terminating his parental rights. Luis also appeals an order denying his petition under section 388 seeking placement of Bella with him. He contends the court erred in finding that it would not be in Bella's best interests to grant his section 388 petition and that there was not a beneficial parent-child relationship between him and Bella within the meaning of section 366.26, subdivision (c)(1)(B)(i) that precluded the termination of his parental rights. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This is Luis's second appeal in this case. On July 14, 2015, we filed an unpublished opinion affirming the juvenile court's order terminating Luis's family reunification services under section 366.21, subdivision (e). (*In re Bella P.* (July 14, 2015, D067508).) Our summary of the facts and procedural history through the six-month review hearing is derived from our prior opinion.

On March 28, 2014, the San Diego County Health and Human Services Agency (the Agency) petitioned the juvenile court under section 300, subdivision (b) on behalf of one-month-old Bella. The Agency alleged that Bella had tested positive for opiates at birth, suffered withdrawal symptoms, and had little prenatal care. The Agency further

---

[1]     All further statutory references are to the Welfare and Institutions Code.

alleged that Bella's mother K.W. had tested positive for opiates and had a long history of drug abuse, including abuse of heroin and methamphetamines. Luis admitted a history of drug abuse as well, but he denied knowing that K.W. had used drugs during pregnancy. The Agency concluded that Bella had suffered, or was at substantial risk of suffering, serious physical harm or illness as a result of her parents' failure to protect her or provide for her care.

At the time of the petition, Luis was incarcerated on charges of receiving stolen property and driving with a suspended license. Luis had previously been convicted of second degree robbery and several parole violations. He had a documented gang affiliation and a juvenile record that included a conviction for forced oral copulation of a 12-year-old girl at a group home. Luis was 17 years old at the time. Luis was also accused of touching his brother inappropriately.

The Agency submitted a case plan for Luis and attempted to provide him reunification services, but Luis was unable to participate in services because of his classification in jail. Shortly after he was released from jail, Luis was arrested again on a probation violation and was eventually transferred to state prison. The Agency contacted prison officials to inquire about providing Luis reunification services and was informed that Luis would not have access to any services because he was an unclassified prison inmate subject to maximum security restrictions. On the Agency's recommendation, the court terminated Luis's reunification services at the contested six-month review hearing. As noted, Luis appealed the order terminating his services and this court affirmed the order.

3

In its status review report for the 12-month review hearing, the Agency recommended the court terminate K.W.'s reunification services and set a section 366.26 hearing. The report noted Luis was released from prison in April 2015 and was on the waiting list for a residential rehabilitation program known as Lighthouse. The Agency arranged weekly supervised visits between him and Bella. On April 20, 2015, Luis visited Bella for the first time since she was a month old.

Bella remained in the confidential foster home where she had been placed since her release from the neonatal intensive care unit, and the court granted the foster parents de facto parent status in October 2014. Bella was in good health and was receiving "very good care" in her foster home. She was receiving specialized services, including physical therapy, occupational therapy, and early intervention services, due to her developmental delays and various medical diagnoses. She took medication for asthma and was being monitored by an ophthalmologist for astigmatism. The Agency concluded: "Bella is a special needs child and all of her special needs are met by her current caregivers. [The caregivers] also provide a nurturing environment with appropriate levels of guidance and structure. The caregivers plan to continue to provide the parents and families opportunities to visit Bella and to have a relationship with her."

Bella had established a strong emotional bond with her caregivers and tended to look for comfort from the caregiver attending her visits with Luis rather than from Luis. Luis realized that he needed to continue regular visits in order for Bella to form a more trusting relationship with him, and the Agency gave Luis credit "for being so mature in this regard." However, the Agency did not support reinstating reunification services for

4

Luis, noting Luis "had opportunities which he did not take advantage of while Bella was an infant." The Agency stated that when reunification services are unsuccessful, "the Agency must look at permanency for the child. Now, at age 15 months, Bella's need for permanency is significant. She is happy and healthy and most importantly safe in her current home. The Agency's level of concern regarding [Luis's] ability to rehabilitate given his history with drug abuse and criminal activity is high. Simply put, his efforts have been too little and too late."

A court-appointed special advocate (CASA) for Bella reported in May 2015 that Bella was showing age appropriate behavior and was walking and learning sign language. Bella had a "wonderful relationship" with her foster parents and perceived them as "authority figures and [sought] appropriate comfort from them. She receive[d] physical affection from them freely." The foster parents were "vocal advocates for Bella's needs and well[-]being and [were] very involved and committed to ensuring that Bella receive[d] necessary support, resources, and services." They were willing to adopt Bella if reunification was unsuccessful.

On May 26, 2015, Luis filed a section 388 petition requesting that the court reinstate his reunification services to the 18-month review date because he had been released from custody, was enjoying visitation with Bella, was in a residential substance abuse treatment program, and was "participating in services on his own." Luis alleged the requested order would be better for Bella because he was eager to improve his situation and be a good father to Bella, and reinstatement of services would support him and allow Bella the opportunity to be raised by her biological father. At the 12-month

5

review hearing on May 26, the court denied Luis's petition without prejudice to refile it at a later date, "given the shortness of the time of [Luis's] efforts to . . . reconnect with [Bella]." K.W. requested a trial and the court set a contested 12-month review hearing for June 24, 2015.

At the contested 12-month review hearing on June 24, 2015, the court terminated K.W's reunification services, set a permanency hearing under section 366.26 for October 22, 2015. The court continued Bella's placement in her foster home.

On September 1, 2015, Luis filed two petitions under section 388. One petition requested that the court change its order placing Bella in her foster home and order the Agency to assess three relatives—a maternal cousin, the paternal grandmother, and a paternal aunt—for possible placement. The petition also asked the court to order Skype and telephone contact between Bella and the "maternal aunt."[2] The other petition requested that the court reinstate Luis's reunification services. As changed circumstances, Luis alleged he had been released from custody and was currently in compliance and had tested clean on all of his drug tests, and he had been living and participating in the Lighthouse program since May 29, 2015. He was attending classes on addiction and sober living and was consistently visiting Bella.

The Agency filed an addendum report opposing Luis's section 388 petition requesting reinstatement of reunification services. The Agency felt reunification would not be in Bella's best interests given Luis's gang affiliation, criminal history, and not

---

[2]     Luis's petition inconsistently referred to a "maternal cousin" and "maternal aunt."

having completed services. The Agency acknowledged that Luis had made recent positive steps in his previous reunification plan, but did not feel it was "evidentiary of a change of circumstances that would warrant reinstatement of reunification services." The Agency did not oppose Skype and telephone contact between Bella and the maternal cousin.

At a hearing on September 22, 2015, the court dismissed Luis's section 388 petition as to the request for assessment of relatives for placement and granted the petition as to the request for telephone and Skype contact between Bella and the maternal cousin. The court summarily denied Luis's section 388 petition seeking reinstatement of reunification services. Luis has not appealed these orders.

In its report for the section 366.26 hearing, the Agency recommended the court terminate parental rights and order adoption as Bella's permanent plan. The Agency reported that Luis's visits with Bella had gone well. Luis had been attentive to Bella's needs except on two occasions when he was very involved with his cellphone. Bella appeared happy during visits, and she and Luis appeared to enjoy each other's company. Luis played with Bella, read to her, brought her gifts, and fed her snacks that the caregivers had packed for her. He was affectionate with her and praised her when she shared her toys with other children and appropriately used the sign language the caregivers had taught him to communicate with her. Bella separated easily from Luis at the end of visits without appearing distressed.

The CASA's observations of Luis's visitation with Bella were less positive than the Agency's. The CASA filed a report in October 2015 for the section 366.26 hearing in

7

which she reported her observations from three visits between Luis and Bella in June, July, and September, respectively. The CASA noted that Bella did not show excitement when she saw Luis at the beginning of the visits or sadness at the end of the visits. Bella looked to her caregivers for comfort and support and rarely sought Luis's attention. When she did it was typically to take his cellphone from his hand. Luis used his phone frequently and the caregivers "consistently reminded" him to refrain from using profanity. The CASA reported that although in May 2015 the court had given the Agency discretion to offer more frequent visitation to Luis, Luis had not contacted the social worker to follow through. Luis was authorized to call the caregivers daily between 9:30 a.m. and 10:00 a.m. to inquire about Bella, but had called only 17 times in six months and had last called on August 24, 2015. Luis attributed his lack of communication to being tired or busy.

The Agency reported that Bella's caregivers were interested in adopting her and she was generally adoptable, although she required extensive services to aid in her developmental delays. The Agency's assessment was that although it was apparent that Luis loved Bella and was caring toward her and concerned about her well-being, his circumstances prevented him from safely parenting her. The Agency noted Luis was attending a drug treatment program and his prior incarceration had prevented him from developing a relationship with Bella during the first months of her life. The Agency acknowledged that after his incarceration, Luis had been involved in Bella's life and maintained consistent visitation. However, it did not appear that Bella experienced significant distress before or at the end of her visits with Luis "to argue that the

parent[-]child bond exception would apply in this case."  Bella looked primarily to her caregivers to meet her emotional and physical needs.  The Agency recommended adoption as Bella's permanent plan.

The CASA's assessment was that Bella was "an amazing, lovely little girl" who had overcome great obstacles and was "a product of the stability, love, and tenacity of her caregivers."  The caregivers' home was the only home Bella had known and the caregivers had "been there for every medical procedure and appointment, every late night and early morning, every diaper change, every laugh, and every tear."  The CASA agreed with the Agency's recommendation to terminate parental rights and identify adoption as Bella's permanent plan.

On October 22, 2015, Luis filed a section 388 petition requesting that the court place Bella with him.  Luis alleged that he had been incarcerated for the majority of his reunification period and that since his release, he had made efforts to engage in services on his own and had been consistent in trying to be a good father and productive citizen. He had been living and participating in the Lighthouse program since May 29, 2015, and was attending classes on addiction/relapse, therapy, employment, and sober living.  He would be obtaining independent housing in November, and had been consistently visiting Bella.  The court granted Luis an evidentiary hearing on his petition to precede the contested section 366.26 hearing on December 7, 2015.

In an addendum report filed on December 7, 2015, the Agency acknowledged that Luis loved Bella and had made commendable progress in completing various services. However, the Agency was opposed to Luis's request to return Bella to his care because

Luis had "not provided substantial evidence that a significant change [had] occurred that would allow him to safely parent Bella." The Agency's opinion was that the parent-child relationship between Luis and Bella did not outweigh the benefits of Bella being adopted and that it would be in Bella's best interests to remain with her current caregivers, who were the only parental figures Bella had known. The Agency concluded the benefit of adoption outweighed any detriment that would occur from terminating parental rights and recommended adoption as Bella's permanent plan.

At the evidentiary hearing on Luis's section 388 petition, the court granted Luis's oral request that his petition encompass both his request to return Bella to his custody and his alternative request to place Bella with a relative. The court received into evidence a number of updated letters supporting the petition and the Agency's report for the section 366.26 hearing and subsequent addendum report opposing the petition. After hearing testimony from Luis and argument from counsel, the court denied Luis's section 388 petition both as to Luis's request to place Bella with a relative and his request to return Bella to his custody. The court found there had been a change in Luis's circumstances, but it was not in Bella's best interests to be returned to Luis's custody.

The court then proceeded to the section 366.26 hearing and considered the evidence it had received for Luis's section 388 petition, including Luis's testimony. After hearing argument from counsel on the section 366.26 issues, the court found by clear and convincing evidence that Bella was likely to be adopted and that none of the circumstances specified in section 366.26, subdivision (c)(1)(B) that would make

10

termination of parental rights detrimental to her existed. The court terminated parental rights and referred Bella to the Agency for adoptive placement.

DISCUSSION

## I. *Section 388 Petition*

Luis contends the court erred in denying his section 388 petition to place Bella with him.[3] Section 388 provides that, "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

In ruling on a section 388 petition, the court must consider whether the requested relief is in the child's best interests. (*In re Jasmon O*. (1994) 8 Cal.4th 398, 415.) We review the juvenile court's determination for an abuse of discretion and will not disturb that determination " ' "unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318 (*Stephanie M.*).) In deciding whether a denial of a section 388 petition was an abuse of discretion, we bear in mind that after the termination of reunification services, a parent's "interest in the care, custody and companionship of the child [is] no longer paramount. Rather, at this point[,] 'the focus

---

3 Luis does not challenge on appeal the court's denial of his request to place Bella with the maternal cousin.

shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child." (*Stephanie M.*, at p. 317.)

Although we review the court's decision on a section 388 petition for abuse of discretion, the practical differences between this standard of review and the substantial evidence standard are not significant. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*).) " '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only " 'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' . . ." ' " (*Ibid.*) In other words, there is no abuse of discretion when the factual findings underlying the court's exercise of discretion are supported by substantial evidence. (See *People v. Cluff* (2001) 87 Cal.App.4th 991, 998 ["A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence."]; *Johns v. City of Los Angeles* (1978) 78 Cal.App.3d 983, 990 [abuse of discretion to order a new trial based on juror misconduct if no substantial evidence supports a finding of bias]; *West v. Lind* (1960) 186 Cal.App.2d 563, 566 [discretion to order preliminary injunction upheld if factual determinations are supported by substantial evidence]; *In re John F.* (1994) 27 Cal.App.4th 1365, 1375-1376 [petitioner's burden on section 388 petition is to show by a preponderance of the evidence that modification of the order promotes the child's best interests].)

The court's denial of Luis's section 388 petition was not an abuse of discretion because Luis did not present sufficient evidence to rebut the presumption that continuing Bella's foster placement was in her best interests. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) Although Luis showed that he had made great progress in turning his life around after his most recent release from incarceration and that his visitation with Bella had become consistent and had gone well, the evidence strongly supports the court's finding that it would not be in Bella's best interests to be removed from the custody and care of her foster parents.

Luis had never assumed a parental role with Bella that evidenced an ability to care for her on a day-to-day basis. The Agency stated in its December 7, 2015 addendum report: "[I]t would be in Bella's best interest to remain in her current placement home as her relationship with her current caregivers outweighs the relationship with [the maternal cousin]. It would be crucial for Bella's future to be provided with the stability that the current caregivers have been able to provide her with. This stability from a permanent home can strengthen the resilience of the child in care and improve any negative impacts on her developmental outcomes. Also, Bella's current caregivers are essentially the only parental figures that Bella has known her whole life [and] she looks to them to meet her every day needs."

In denying Luis's section 388 petition, the court stated that it had "to be cognizant of the fact that Bella was exposed in-utero to drugs. [¶] Because of that, she was presented with many challenges. She has sensory issues. She has asymmetry difficulties that have led to the need for some physical therapy. She has asthma where she's taken

13

some steroid nebulizer treatment.  She has astigmatism, . . . which is being followed, and she may have corrective lenses or some assistance."  The court reasonably found it would not be in Bella's best interests to be removed from her foster parents and placed with Luis because "Bella has formed a complete attachment to her current caretakers.  She has responded, through the strength of that attachment, to begin to overcome the challenges and disabilities that she had visited upon her because of her in-utero exposure to drugs. She is beginning to explore her world.  She has sensory problems, but she is getting enough confidence so she can explore her world without the corresponding anxiety and stress that she once experienced in that endeavor.  [¶]  So, in gauging the relative strengths of the attachment, it's real clear that that would have to [militate] or balance in favor of the current caretakers.  In addition, Bella's special needs, for lack of a better term, require that there be a consistency in her environment."

The court noted that Luis's incarceration prevented him from having any meaningful contact with Bella for the first year of her life, and that he required time to complete his process of changing his life for the better.  The court believed Luis was going to continue to progress, but acknowledged that "much of that [belief] at this point in time is just feelings and speculation."  Thus, although the court found Luis's circumstances had changed, it recognized that Luis was still in a state of transition from his former life of drug abuse and criminal behavior and that placing Bella with Luis would involve a risk to her future well-being.  Based on the evidence that Bella needed the stability and permanency she had received from her foster parents her entire life and the lack of evidence that Luis had the present ability to care for Bella on a fulltime basis,

14

the court reasonably found it was not in Bella's best interests to be removed from her foster parents and placed with Luis. Because substantial evidence supports that finding, the court did not abuse its discretion in denying Luis's section 388 petition.

## II. *Termination of Parental Rights*

Luis contends the court erred in finding that there was not a beneficial parent-child relationship between him and Bella within the meaning of section 366.26, subdivision (c)(1)(B)(i) that precluded the termination of his parental rights. " 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.] 'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). [Citations.] Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." ' " (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1165.)

This court has interpreted "the 'benefit from continuing the [parent[-]child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the

sense of belonging a new family would confer.  If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

"A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence.  [Citation.]  It is not enough to show that the parent and child have a friendly and loving relationship.  [Citation.]  ' "Interaction between [a] natural parent and child will always confer some incidental benefit to the child . . . ." '  [Citation.]  For the exception to apply, 'a *parental* relationship is necessary[.]'  [Citation.]  ' "While friendships are important, a child needs at least one parent.  Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent." ' "  (*In re J.C.* (2014) 226 Cal.App.4th 503, 529 (*J.C.*).)

Appellate courts have applied different standards of review to the parent-child beneficial relationship exception.  (See *In re K.P.* (2012) 203 Cal.App.4th 614, 621.)  Most courts initially applied the substantial evidence standard.  (See *ibid.*; *J.C.*, *supra*, 226 Cal.App.4th at p. 530.)  However, our court recently applied a "hybrid standard," under which "[w]e apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination

16

would be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.)[4]

We will apply the hybrid standard.[5]

We conclude that Luis has not met his burden of showing the juvenile court abused its discretion in determining that termination of parental rights would not be detrimental to Bella. Luis showed that he and Bella had a friendly and loving relationship, but did not show that his relationship with Bella promoted her well-being to such a degree as to outweigh the well-being she would continue to enjoy in a permanent home with her adoptive parents. Luis's contact with Bella was limited to supervised visitation in a play setting; he had not yet progressed to unsupervised visitation. The CASA noted that Bella did not show excitement when she saw Luis at the beginning of the visits or sadness at the end of the visits, and that she looked to her caregivers for comfort and support and rarely sought Luis's attention.[6]

The Agency social worker also noted that Bella consistently separated easily from Luis at the end of visits. The social worker opined that the parent-child relationship

[4] Division Three of this District also recently applied the hybrid standard. (See *J.C.*, *supra*, 226 Cal.App.4th at p. 531.)

[5] As a practical matter, the analysis is essentially the same under either standard of review. As noted above, " '[e]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only" 'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order [under review].'. . ." ' " (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.)

[6] The court was required to consider the CASA's report for the section 366.26 hearing (Cal. Rules of Court, rule 5.725(d), and we presume the court did so.) (Evid. Code, § 664.)

between Luis and Bella did not outweigh the benefits of Bella being adopted and that it would be in Bella's best interests to remain with her current caregivers, who were the only parental figures Bella had ever known. The court was entitled to find the social worker's opinion credible and to give it greater weight. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)

As noted, to overcome the preference for adoption and preclude termination of parental rights at a permanency plan hearing, the evidence must support a finding that "severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that *the child would be greatly harmed . . . .*" (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575, italics added.) Although Luis argues that Bella would benefit from continuing a parent-child relationship with him and having relationships with her biological relatives, he does not cite any evidence in the record that Bella would be greatly harmed by termination of his parental rights.

At the section 366.26 hearing, the court found that "termination of parental rights . . . would not be detrimental to Bella, pursuant to any of the subdivisions [of section 366.26]." The court noted that Bella did not express separation anxiety at the end of her visits with Luis and did not "in any age-appropriate fashion inquire about [Luis] in between visits." The court found that "it would not be in Bella's best interest to promote or facilitate a father/child relationship and . . . that whatever benefit may have been conferred upon Bella by the contact she has with [Luis] is greatly outweighed by her need for stability and placement which can only be achieved through adoptive placement."

18

Thus, the court effectively found that Bella would not be greatly harmed by severance of her natural parent-child relationship with Luis. Assuming the evidence showed the existence of a parent-child relationship between Luis and Bella that provided some benefit to Bella, the court could reasonably find that severing that relationship would not cause Bella to be greatly harmed because uncontroverted evidence showed she was secure, happy, and thriving in the care of her foster parents, who had consistently met her special needs and were the only parental figures she had ever known. In addition to the reports filed by the Agency and the CASA, the strong parent-child bond between the foster parents and Bella was evidenced by the fact that the court granted the foster parents de facto parent status in October 2014.

Although Luis enjoyed positive interaction with Bella during his supervised visitation, substantial evidence supports the court's findings that Bella would not be greatly harmed by severance of her relationship with Luis, and that it would be in her best interests to remain in the custody and care of her foster parents. Accordingly, the court did not abuse its discretion in determining that Luis did not have a beneficial parent-child relationship with Bella within the meaning of section 366.26, subdivision (c)(1)(B)(i) that precluded the termination of his parental rights.

DISPOSITION

The order denying Luis's section 388 petition is affirmed. The order terminating parental rights and selecting adoption as the permanent plan for Bella is affirmed.

_____

HALLER, Acting P.J.

WE CONCUR:


_____

MCDONALD, J.


_____

AARON, J.